

July 12, 2024

**VIA E-FILING**
The Honorable Sherry R. Fallon
J. Caleb Boggs Federal Building
844 N. King Street                                    **FILED UNDER SEAL**
Room 3124, Unit 14
Wilmington, DE 19801-3555

      **Re:**    ***AlmondNet, Inc., et al. v. Viant Technology Inc., et al.***
                    <u>**C.A. No. 23-cv-174-MN**</u>

Dear Magistrate Judge Fallon,

        AlmondNet's contentions fully comply with this Court's Scheduling Order and this District's Default Discovery Standard. They provide more than sufficient notice to Viant of the Accused Instrumentalities and how they infringe. AlmondNet's patents relate to novel internet / network based advertising systems and methods. Thus, AlmondNet has accused Viant's advertising platform and its related services and components—the Accused Instrumentalities. AlmondNet repeatedly articulated this to Viant. AlmondNet's charts lay out how exactly Viant's advertising platform infringes, and explains how the related services and components tie to the infringement of the advertising platform. Viant seeks to require far more from AlmondNet than is required by the Paragraph 4 disclosures governing initial claim charts and by the case law in this District, in unnecessarily requiring AlmondNet to separately chart related services and components, despite the sufficiency of its charting.

**I.**      **Background**

        As AlmondNet explained in its Complaint, the Accused Instrumentalities include Viant's advertising platform products and related services and components. *See* D.I. 1 ¶¶ 14, 25, 36, and 47. This is terminology that should be readily familiar to Viant, as Viant uses this terminology itself. Ex. A at 1 (Viant "collect[s], use[s], and disclose[s] information about you in connection with our demand side advertising platform and related services. . .").[1] In AlmondNet's December 15, 2023 identification of Viant's Accused Instrumentalities, AlmondNet confirmed that the claims of the asserted patents are infringed by Viant's ███████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ as well as other related services or components. Ex. 5 at 2 (emphasis added). Subsequently, in AlmondNet's Second Set of

---

[1] According to Viant's Ad Platform Privacy Policy, Viant "collect[s], use[s], and disclose[s] information about you in connection with our demand side advertising platform and related services we provide to advertising agencies, advertisers, and other companies (our 'Clients') that allow them to plan and execute digital media advertising campaigns and measure and analyze the performance of those campaigns (collectively, our 'Ad Services')." https://www.viantinc.com/wp-content/uploads/2024/06/Viant-Privacy-Policy-6.27.24.pdf.

Requests for Production AlmondNet again confirmed that the Accused Instrumentalities "mean *the products and systems identified in AlmondNet and Intent IQ's Disclosure of Accused Products, Accused Methods and Systems*, and Damages Model, served December 15, 2023, including without limitation the ██████████████████████████████ ███████████████████████████," as well as other related services or components. Ex. 6 at 2.

AlmondNet served its initial Infringement Contentions providing Viant ample notice of what it contends infringes and further supplemented its contentions to provide even more detail upon receipt of certain materials from Viant. AlmondNet's infringement contentions now encompass over 750 pages of charts with detailed narrative explanations and citations to exemplary documents, setting forth exactly what advertising platform and accompanying related services or components are alleged to infringe and how they infringe—far beyond what is required for infringement contentions in this District. Viant fails to explain how any of this is deficient.

For instance, even with Viant's example from claim 1 of the '249 patent, it is clear that the following are related services or components of the advertising platform: ██████████ ███████████████████████████████████████████████████████ ██████████████████████████████████. *See* Ex. 3 at 6. AlmondNet placed Viant on notice that these are relevant services or components that AlmondNet may have its infringement expert analyze in greater detail at a later stages of this case.

## II.    Legal Standard

In this District, the plaintiff must provide enough detail in its infringement contentions to provide notice to the defendant of the plaintiff's infringement theories. *See Wi-Lan Inc. v. Vizio, Inc.*, 2018 WL 669730, at *1 (D. Del. January 26, 2018); *Cosmo Technologies Limited v. Lupin Ltd.*, 2017 WL 4063983, at *1 (D. Del. Sept. 14, 2017). The plaintiff satisfies this requirement by putting defendant on notice of its theory of how the defendant meets the elements of the asserted claims. *Wi-Lan Inc.*, 2018 WL 669730, at *1. Thus, so long as defendant is adequately placed on notice, not every accused product has to be separately charted, let alone related services or components. *See* Ex. B at 25 (*XMITT, Inc. v. Intel Corporation,* C.A. No. 18-1810-RGA-SRF, Tr. 26:6-16, 27:25-28:17 (D. Del. Mar. 12, 2020) (explaining that representative charts grouping 700 accused processors "are supposed to be is sufficient")); *Greenthread, LLC v. OmniVision Technologies, Inc.*, 2024 WL 1744069, *3–4 (E.D. Tex. 2024) ("Further, Greenthread is not required to provide infringement charts for every Accused Product. It is sufficient at this stage that Greenthread has charted a representative product and articulated its theory of how this product is representative of the other Accused Products."). Furthermore, AlmondNet need not prove infringement at this stage of this case. *Wi-Lan Inc.*, 2018 WL 669730, at *1; *see also* Ex. B at 25 (*XMITT*, Tr. 28:7-17 (rejecting the need to disclose a level of analysis sufficient to survive summary judgment)).

### III.     Argument

AlmondNet provided a detailed limitation-by-limitation analysis of how Viant's advertising platform infringes. *See, e.g.*, Ex. C. at 1-78 ('260 patent, claim 1(pre)-(b)); Ex. 2 at 2-11 ('015 patent, claim 14(pre)-(b)(ii)); Ex. 3 at 2-65 ('249 patent, claim 1(pre)-(e)); Ex. 4 at 2-9 ('307 patent, claim 1(pre)-(e)). AlmondNet further explained what related services and components it believed were relevant to its infringement analysis of the advertising platform, and how those related services and components were related to the asserted claims. AlmondNet's limitation-by-limitation analysis provided detailed excerpts from diagrams and text of Viant's documentation as well as "at least a paragraph of explanation for why each limitation is met" by the advertising platform. *Pragmatus Telecom LLC v. Newegg Inc.*, 2016 WL 675529, at *3 (D. Del. February 18, 2016).

AlmondNet does not need to prove infringement at this stage. *See Wi-Lan Inc.*, 2018 WL 669730, at *1. When it advised Viant that relevant services or components to the advertising platform included for instance, ███████████████████████████████████ AlmondNet was simply placing Viant on notice that these are relevant services or components that AlmondNet may have its infringement expert analyze in greater detail at a later stage. *See Gillette Company v. Dollar Shave Club, Inc.*, 2018 WL 3528720, at *2 (D. Del. July 23, 2018) (denying Defendant's request to compel supplemental infringement contentions where the detail sought was more properly for expert reports); *3G Licensing, S.A. v. Blackberry Limited,* C.A. 17-82-LPS-CJB (D. Del. Apr. 20, 2018) (finding supplementation of contentions not required, noting that "defendants will learn more about the plaintiffs' case as the case goes forward through claim construction, further discovery, and ultimately expert reports").

Separate charts for these relevant services or components are not appropriate where there is adequate charting for the advertising platform itself. *See* Ex. B at 25 (*XMITT*, Tr. 26:6-16, 27:25-28:17). And here, there is a detailed explanation of how the relevant services or components relate to the accused advertising platform, with respect to infringement. *See, e.g.*, Ex. C. at 1-78 ('260 patent, claim 1(pre)-(b)); Ex. 2 at 2-11 ('015 patent, claim 14(pre)-(b)(ii)); Ex. 3 at 2-65 ('249 patent, claim 1(pre)-(e)); Ex. 4 at 2-9 ('307 patent, claim 1(pre)-(e)).

Viant's "arguments simply nitpick at details it [wants] clarified." *Pragmatus*, 2016 WL 675529 at *3; *see also ID Image Sensing LLC v. Omnivision Technologies, Inc.*, 20-00136-RGA-JLH, D.I. 46 at 1 (D. Del. July 12, 2021) (denying defendant's request for the Court to compel supplemental infringement contentions, noting that a motion to compel is not the appropriate place to litigate the merits of Plaintiff's theory).

For instance, Viant points to AlmondNet's mapping of claim 1 of the '249 patent against the Accused Instrumentalities to argue that the infringement contentions fail to identify the specific products or combination of products allegedly infringing each asserted claim, and more generally fail to show AlmondNet's theories of infringement. D.I. 76 at 1. Claim element 1[a] of the '249 patent requires: "electronically receiving at a programmed computer system coupled to a global computer network, from at least one server controlled by one of a plurality of unaffiliated third parties, a partial profile of an entity that uses a user computer coupled to the global computer network and accessing a website, which partial profile is available to one of the

third parties and contains at least one profile attribute related to the entity." Ex. 3 at 3. AlmondNet clearly explained how Viant's advertising platform, met this limitation. (*See* Ex. 3, at 3-59). For example, AlmondNet identified ████████████████████ as exemplary services or components utilized by the advertising platform to meet this limitation. *Id.* Viant appears to be seeking separate charts for ████████████████████ but this is not appropriate. *See* Ex. B at 25 (*XMITT*, Tr. 26:6-16, 27:25-28:17).

Similarly, for limitation 1(b), AlmondNet maps ████████████████ ████████████ as exemplary services or components that Viant's advertising platform utilizes. Ex. D at 63-80 ('249 patent, claim 1(b)). For limitations 1(c)-(e), AlmondNet does the same, including through components such as the ████████ (for limitation 1(c)); Profile and/or ████ (for limitation 1(d)); and ████████ (for limitation 1(e)). Ex. D at 80-109 ('249 patent, claim 1(c)); *Id.* at 109-116 ('249 patent, claim 1(d)); *Id.* at 116-129 ('249 patent, claim 1(e)).

Viant's position focuses solely on a purported lack of continuity across AlmondNet's mapping of this claim. However, as shown above AlmondNet is consistently mapping infringement of this exemplary claim to Viant's advertising platform, along with related services and components. The cited documentation describes how the advertising platform, along with related services and components, meet the limitations of claim 1 of the 249 patent. Nothing more is required to put Viant on notice of how the Accused Instrumentalities meet this claim. The same is true for all of the Asserted Claims and AlmondNet's mappings thereof.

Viant's reliance on *Personal Audio, LLC v. Google LLC*, is misplaced. C.A. No. 17-1751-CFC-CJB, 2018 WIL 11656746, at *1 (D. Del. Nov. 15. 2018). If anything, *Personal Audio* simply states that infringement contentions must provide adequate notice with respect to all accused products, and AlmondNet's charts do exactly that.  Instead, the *XMITT* case as mentioned above provides more relevant guidance here, indicating that the charting of related services and components is not necessary. *See* Ex. B at 25 (*XMITT*, Tr. 26:6-16, 27:25-28:17).

Accordingly, for the foregoing reasons, Viant's request for relief should be denied.

Respectfully submitted,

*/s/ Brian E. Farnan*

Brian E. Farnan

cc: Counsel of Record (Via E-Mail)

# EXHIBIT A



# VIANT AD PLATFORM PRIVACY POLICY

**Last updated**: June 27, 2024.

This Platform Privacy Policy describes how Viant Technology Inc. and our subsidiary and affiliate companies that share common branding (collectively, "Viant," "we," or "us"), collect, use, and disclose information about you in connection with our demand side advertising platform and related services we provide to advertising agencies, advertisers, and other companies (our "Clients") that allow them to plan and execute digital media advertising campaigns and measure and analyze the performance of those campaigns (collectively, our "Ad Services").

To opt out of Viant using and disclosing your information for certain advertising purposes, please see "Your Choices" below or visit our Privacy Center.

Please note that this Platform Privacy Policy covers the information we process as a "data controller" and does not apply to information we handle on behalf of our Clients (i.e., when Viant acts as a service provider/processor). To review our website and corporate privacy policy, please click here.

**Contents**

- Information We Collect
- How We Use Information
- How We Disclose Information
- Your Choices
- Children's Information
- Data Retention
- Additional Information for Residents of Certain States
- Additional Information for EU Residents
- Updates To This Platform Privacy Policy
- Contact Information

# 1.   INFORMATION WE COLLECT

Like other digital advertising companies, our Ad Services rely on identifiers and other data about your online and offline activity to help our Clients run more effective advertising campaigns.

### *Categories of information we collect*

To power our Ad Services, we collect data about consumers of digital media ("you" or "Users"), devices, and ads and where they're published. The categories of information we collect include:

- Pseudonymous identifiers (meaning identifiers that do not directly identify Users), such as IP addresses, cookie identifiers, mobile advertising identifiers, and other device identifiers, such as those associated with your connected television ("CTV").

- Other identifiers, such as email addresses (from which we generate pseudonymized versions) and postal addresses.

- Browser and device information, such as device type and model, manufacturer, operating system type and version (e.g., iOS or Android), web browser type and version (e.g., Chrome or Safari), carrier name, time zone, and network connection type (e.g., Wifi or cellular).

- Interest and demographic information about Users, such as audience interest segments and purchase information, including interest information we infer or generate, and information made available in our Ad Services by others.

- Location information, including when inferred from an IP address and sometimes including precise geolocation information (GPS data) if provided via our Ad Services by others.

- Data about advertisements shown and User engagement with the ad, such as the type of ad, where it was shown, whether the User clicked on it, how many times the User has seen a given ad, and whether the User subsequently visited the Client's site or app, made a purchase, or took other actions based on the ad.

- Other information about Users' activity online and in mobile apps, such as sites visited, duration of visit, and activities on these properties.

### *Sources of information*

Our Ad Services receive information from a host of sources, including:

- Information collected automatically about Users through cookies and similar tracking technologies, including pixels, web beacons, and, in mobile apps, SDKs, used by Viant, our Clients, and our data partners. These technologies automatically collect information about the sites and apps you visit and help our Ad Services identify devices and browsers over time and across services.

- Our Clients upload information to the Ad Services, such as information about audiences or identifiers they aim to reach with their advertising campaigns.

- We work with data partners who make information available on our Ad Services for us and our Clients to use to improve their advertising campaigns and measure the effectiveness of those campaigns.

- Other stakeholders in the digital advertising ecosystem, particularly companies that provide information about ad space available on sites, apps, CTVs, and other devices or services that publish ads (also known as the "supply" side of the advertising ecosystem). These supply stakeholders share bid requests with us that describe available ad space and typically include identifiers, information about the device, and other information that the supply stakeholder chooses to include. Viant can often match the bid request data with other identifiers we have in our Ad Services, which helps our Clients more effectively target their advertising campaigns.

- Our Ad Services may receive information from MySpace LLC, which is a Viant affiliate, subject to the [MySpace Privacy Policy](#).

## 2.    HOW WE USE INFORMATION

***Providing Ad Services*:** We use the information we collect to provide our Ad Services, including to:

- Help our Clients develop and execute digital advertising campaigns that reach their intended audiences;

- Enable technical delivery of our Clients' ads;

- Measure, evaluate, and report on the effectiveness of ads, such as by determining whether a User clicked on the ad or took another action after seeing the ad; and

- Limit the number of times a User sees the same ad (known as "frequency capping").

***Building our Identity Graph and Interest Segments*:** We also use the information we collect to build and improve our identity graph, which involves combining information collected across multiple sites, devices, and mobile apps to create profiles and interest segments that help us more effectively target future advertisements. We do so by establishing connections between a User's devices, including by cookie matching and linking devices to common data or activities, sometimes based on assumptions. Cross-device connections allow Viant to infer that a single User or household is accessing advertisements served or measured by Viant from multiple devices and to better target advertising and measure the performance of advertisements across those devices.

In building our identity graph and providing our Ad Services, we may combine information we receive about you from third parties (including our affiliates) with other information that we

hold about you. We and our Clients use this combined information to create interest-based segments that we and our Clients can use to display more relevant advertisements and other content to Users.

***Other Purposes***: We also use the information we collect to improve, protect, and operate our business, including to:

- Detect and protect against fraud or malicious activity in connection with our Ad Services;
- Analyze and improve our Ad Services;
- Develop new products and services;
- Protect the rights and property of our Clients, Viant, or others; and
- Comply with our legal and financial obligations.

# 3.   HOW WE DISCLOSE INFORMATION

We may disclose the information we collect in the following scenarios:

- ***Clients and their designees***. We disclose information to Clients or their designees (such as a designated measurement vendor) in connection with providing our Ad Services, such as to report on ad performance or share campaign details.

- ***Publishers and "supply" stakeholders***. We may disclose certain information to publishers, or those operating on their behalf on the "supply" side of the advertising ecosystem, to aid with bidding on ad space and ad delivery.

- ***Affiliates***. We may disclose your information within our family of companies for the purposes described in this Platform Privacy Policy.

- ***Vendors, consultants, and service providers***. We may disclose your information with service providers, vendors, contractors, or agents who perform functions on our behalf, such as providing data storage, technical support for our Ad Services, or fraud prevention services.

- ***Business transfers***. We may disclose information in connection with a reorganization, merger, sale, joint venture, assignment, transfer, or other disposition of all or any portion of our business, or assets.

- ***Legal purposes***. We may disclose your information if we believe it is necessary or appropriate: (a) under applicable law; (b) to comply with subpoenas, warrants, or other legal process; (c) to respond to requests from public and government authorities; (d) to enforce our terms and conditions; (e) to protect our operations or those of any of our affiliates; (f) to protect our rights, privacy, safety or property, and/or that of our affiliates, you or others; and (g) to allow us to establish or exercise our legal rights or defend against legal claims.

# EXHIBIT B

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF DELAWARE

 3

 4   XMITT, INC.,              )
                              )
 5              Plaintiff,     )
                              )  C.A. No. 18-1810(RGA)(SRF)
 6   v.                        )
                              )
 7   INTEL CORPORATION,        )
                              )
 8              Defendant.     )

 9
                              J. Caleb Boggs Courthouse
10                             844 North King Street
                              Wilmington, Delaware
11
                              Thursday, March 12, 2020
12                             2:01 p.m.
                              Discovery Dispute
13                             Teleconference

14
BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
15

16   APPEARANCES:

17

18              FARNAN LLP
                BY:  MICHAEL J. FARNAN, ESQUIRE
19
                    -and-
20
                IRELL & MANELLA LLP
21              BY:  ANTHONY ROWLES, ESQUIRE

22                            For the Plaintiff

23

24

25
```

2

```
 1   APPEARANCES CONTINUED:

 2

 3              MORRIS NICHOLS ARSHT & TUNNELL LLP
                BY:  JACK B. BLUMENFELD, ESQUIRE
 4              BY:  JEREMY A. TIGAN, ESQUIRE

 5                    -and-

 6              DESMARAIS LLP
                BY:  PAUL A. BONDOR, ESQUIRE
 7              BY:  LAURIE N. STEMPLER, ESQUIRE
                BY:  JEFFREY S. SEDDON, II, ESQUIRE

 8                            For the Defendant

 9

10

                     ***  PROCEEDINGS  ***

11

12              THE COURT:  All right.  So this is Judge Andrews
13   in XMITT versus Intel, Number 18-1810.  And I understand we
14   have various people on the line who signed in, and you've
15   got them, too; right?
16              THE REPORTER:  Yes.
17              THE COURT:  So just tell me this:  Who's arguing
18   for plaintiff here?
19              MR. ROWLES:  Good afternoon, Your Honor.  This
20   is Tony Rowles from XMITT.
21              THE COURT:  Okay.  And for defendant?
22              MR. BONDOR:  It will be Paul Bondor from
23   Desmarais LLP on behalf of Intel, Your Honor.  Good
24   afternoon.
25              THE COURT:  Good afternoon.  Okay.  So
```

3

```
 1   Mr. Rowles and Mr. Bondor, if you could, when you're
 2   speaking, start off by identifying yourself since me and
 3   maybe the court reporter, too, would benefit from not having
 4   to guess which male voice is which.
 5              So I did read the letters that were submitted,
 6   Docket Item 82 and 83.  I did look at the nice colored
 7   charts of five pages that Intel submitted.  And you know, so
 8   maybe the best thing to do is to just try to get some
 9   clarity because, as I understand it, really there's two
10   issues.
11              One of which, I would characterize, the first
12   one as being whether or not plaintiff is properly using
13   representative claim charts.  And the second of which I
14   would say is a more granular attack on some of plaintiff's
15   claim charts.
16              So what will be helpful to me and maybe this
17   will indicate that I didn't read these letters close enough,
18   but as I understand it, there's two patents, and so
19   plaintiff has done a "summary chart" for each patent, and
20   then has done nine other claim charts to go along with each
21   summary chart.
22              Is that the right factual situation?
23              MR. BONDOR:  Paul Bondor on behalf of Intel.  At
24   a high level, yes, that's the situation.
25              THE COURT:  Okay.  So can someone tell me at a
```

4

```
 1   high level or at a lower level, I don't really care, how the
 2   nine claim charts that go along with the one summary chart,
 3   what the difference is or how the nine charts expand upon
 4   whatever the summary chart says?
 5              MR. BONDOR:  Yes, again, Paul Bondor.  I can
 6   give you a less idea of that.  So taking as an example I'm
 7   looking from Exhibit F to our letter to the Court.  In
 8   Exhibit F at page 23, basically the summary charts include
 9   for the blocks of claim language sort of all of the
10   information that XMITT has identified in connection with
11   each of those blocks of text.  Then the subsidiary charts do
12   not add anything new.  All they do is break out by the same
13   blocks of text the subportion of the stuff from the summary
14   chart that XMITT is pointing to with respect to particular
15   graphic architectures, but essentially all of the
16   information in the subsidiary charts is already in the
17   summary chart.
18              And you know, from our perspective, and I can go
19   into it in more detail and also hopefully provide a little
20   more background that might be helpful to understanding the
21   dispute, essentially all of those charts, both the summary
22   chart and the subsidiary chart, whatever you look at is
23   essentially a highly repetitive mash-up that, in our view,
24   doesn't give a single coherent use of even a single product,
25   that there are some limitations that throughout all of those
```

5

02:06:58 1 charts rely on a single configuration of a single product
02:07:05 2 family.  And that leads to substantive or rather that
02:07:13 3 approach ignores substantial substantive differences between
02:07:20 4 the 700-plus processors that XMITT asserts to be accused in
02:07:29 5 the case and a convenient laundry list of some of those
02:07:37 6 material differences is actually in our letter to Mr. Rowles
02:07:44 7 on page 2 of Exhibit C to our letter.
02:07:48 8         THE COURT:  Well, so --
02:07:49 9         MR. BONDOR:  And.
02:07:50 10        THE COURT:  -- Mr. Bondor, so I have Exhibit F.
02:07:56 11 You know, I think you used it in your letter, too, but this
02:08:00 12 idea of a mash-up, can you point me in Exhibit F to one page
02:08:06 13 in particular where I can see what you're talking about when
02:08:09 14 you say mash-up?
02:08:13 15        MR. BONDOR:  Certainly.  So for instance, let's
02:08:22 16 see.  What's a good example.
02:09:14 17        So for instance, when I talk about the mash-up,
02:09:26 18 an example would be that if you look at the particular
02:09:52 19 example of the plurality of parallel processors.
02:09:57 20        THE COURT:  Can you tell me what page?
02:10:00 21        MR. BONDOR:  Yes.  Yes.
02:10:02 22        THE COURT:  Yes.  What page is that on,
02:10:04 23 Mr. Bondor?
02:10:04 24        MR. BONDOR:  So I think if we go to Exhibit F at
02:10:10 25 page 69.

6

02:10:11 1         THE COURT:  Okay.  Yeah, I'm there.
02:10:16 2         MR. BONDOR:  Okay.  So if we look at Exhibit F
02:10:21 3 at page 69, this section is repeated throughout all of the
02:10:39 4 contentions with respect to this particular element.
02:10:45 5         THE COURT:  Okay.  And so how is it a mash-up?
02:10:48 6         MR. BONDOR:  It's a mash-up because later in the
02:10:54 7 same -- in sticking here with Exhibit F, for instance, there
02:11:02 8 are, as you go through these various examples, you have
02:11:10 9 material that is taken from different product families.  So, for
02:11:14 10 instance, you have some stuff that refers to Ivy Bridge and
02:11:20 11 is brought from Ivy Bridge.  You have other things that is
02:11:25 12 -- and just by way of example for that, you can look at
02:11:35 13 Exhibit F at 75.  There's a reference there to IVB.  That's
02:11:42 14 Ivy Bridge.
02:11:48 15        THE COURT:  I see URB.
02:11:53 16        MR. BONDOR:  No, I'm sorry.  Yeah, at page 75,
02:11:58 17 the citation to, for instance, the --
02:12:00 18        THE COURT:  Oh, I see, at the very bottom of the
02:12:04 19 page.
02:12:05 20        MR. BONDOR:  It's at the very bottom of the
02:12:07 21 page, but it's also in the middle of the page, too.
02:12:10 22        THE COURT:  Oh, yes.  Sorry.  It looked to me
02:12:17 23 like 4B.  Got it.
02:12:17 24        Okay.  Hold on just a minute, Mr. Bondor.

7

02:12:20 1         MR. BONDOR:  Okay.
02:12:20 2         THE COURT:  Hold on just a minute.
02:12:22 3         MR. BONDOR:  Okay.  I have one thing to add,
02:12:38 4 Your Honor --
02:12:38 5         THE COURT:  Sure.
02:12:38 6         MR. BONDOR:  -- when I have a moment again.
02:12:40 7         THE COURT:  No, go ahead.
02:12:41 8         MR. BONDOR:  So just going back to where I
02:12:43 9 started, Exhibit F, page 69 --
02:12:46 10        THE COURT:  Yes.
02:12:47 11        MR. BONDOR:  -- just by way of example, that
02:12:54 12 particular chart talks about a doorbell function.
02:12:54 13        THE COURT:  Yes.
02:12:55 14        MR. BONDOR:  The doorbell function does not
02:12:58 15 exist across all of the accused processes.  And so, for
02:13:05 16 instance, they rely here on, you know, referring to a
02:13:09 17 doorbell function, but they are in the subchart for which
02:13:15 18 the processors do not have a doorbell function.  They omit
02:13:21 19 this statement, but they don't put in anything to replace it
02:13:27 20 just by way of example.
02:13:29 21        THE COURT:  So hold on a minute now.  So you
02:13:35 22 know, just looking at the claim elements, I don't see the
02:13:38 23 word doorbell.  If they don't put it into the subchart, am I
02:13:47 24 supposed to -- isn't that what you want them to do is to not
02:13:55 25 put it into the subchart where there isn't a doorbell?

8

02:14:00 1         MR. BONDOR:  Well, not quite, Your Honor.  So
02:14:04 2 just by way of example, if we stick here on page 69 of
02:14:09 3 Exhibit F, maybe I can be more direct and plain to you.
02:14:14 4         So if you look on the left-hand side of the
02:14:16 5 claim element, it says, wherein the serial processor is
02:14:19 6 further adapted prior to a transition to a serial
02:14:23 7 processing mode to a parallel processing mode.  And then
02:14:26 8 there's this section to provide for a transfer of updated
02:14:30 9 data from the serial memory to at least one of the plurality
02:14:34 10 of partition memory modules.
02:14:37 11        Do you see that language?
02:14:38 12        THE COURT:  I do.  I do.
02:14:39 13        MR. BONDOR:  Okay.  And then all of that stuff
02:14:46 14 is -- so we have that stuff that's supposed to happen prior
02:14:49 15 to this transition from a serial processing mode to a
02:14:52 16 parallel processing mode.  The line goes on and talks about
02:14:57 17 a corresponding acknowledgement from at least one of the
02:15:02 18 plurality of partition memory modules.
02:15:02 19        THE COURT:  Yes.
02:15:04 20        MR. BONDOR:  So our complaint in terms of
02:15:11 21 understanding what it is that they're actually talking about
02:15:14 22 is that you can go all the way through this entire -- all of
02:15:21 23 the information that they included in the chart, and you
02:15:21 24 will not see, for instance, what it is that they're talking
02:15:31 25 about that is the data that is being transferred.  There's

9

02:15:36 1 nothing that tells us what the data is that's coming from
02:15:40 2 the serial memory, and there's no identification of how
02:15:47 3 whatever those things are is said to get to the plurality of
02:15:52 4 memory modules.
02:15:55 5 And the reason that this makes a difference,
02:16:01 6 Your Honor, is because each of the individual families and
02:16:06 7 architectures have varying configurations that themselves
02:16:12 8 would require those signals and that communication to be
02:16:18 9 traced back and forth from particular memory to particular
02:16:26 10 other things. And so if they wanted to point to a doorbell
02:16:34 11 as something, you know -- again, you know, I just sort of --
02:16:40 12 I dispute the idea that this is just a disagreement with
02:16:44 13 their read. It isn't just a disagreement with their read.
02:16:47 14 It is fundamentally exactly what they are saying constitutes
02:16:55 15 the serial memory that has this data that is going to be
02:17:00 16 transferred prior to a transition. None of that is in
02:17:07 17 there -- is in any of this information.
02:17:09 18 So if, hypothetically, one were to think that
02:17:14 19 the doorbell is something, then, you know, something
02:17:20 20 significant within this clump of claim language, then what
02:17:24 21 we're requesting is that they tell us what part of this
02:17:30 22 language the doorbell is related to, and then that
02:17:33 23 necessarily would mean for disclosure of what their
02:17:39 24 infringement theory is for the products that don't have a
02:17:43 25 doorbell, well, what is it that they're pointing to in

10

02:17:46 1 those, you know, particular products.
02:17:50 2 THE COURT: Well, so Mr. Bondor, it seems to me
02:17:53 3 then that, and I don't know how possible this is, given the
02:17:58 4 limitations of what documents I actually have in hand, but
02:18:06 5 you want to be pointing me, I take it, to some subsidiary
02:18:10 6 chart where the doorbell thing is not present and saying so
02:18:17 7 there's nothing in that chart relating to this particular
02:18:20 8 limitation. Is that something --
02:18:26 9 MR. BONDOR: Yes.
02:18:26 10 THE COURT: -- you can do for me?
02:18:28 11 MR. BONDOR: Yes, we can definitely do that.
02:18:32 12 And I would also -- if I could, I'd like to, you know, point
02:18:37 13 out a few additional of those same types of shortcomings
02:18:43 14 that are material to the disputes in the case and that, in
02:18:47 15 our view -- and the reason that we're bringing it to the
02:18:50 16 Court is because, in our view, they're going to
02:18:53 17 substantively shape -- substantively shape discovery and
02:18:57 18 have the potential to make discovery, you know, efficient
02:19:03 19 and fair, as well as, for instance, shape the choice of what
02:19:10 20 30(b)(6) witnesses might talk about things because, as you
02:19:14 21 can imagine, in a large company, there are large groups of
02:19:17 22 engineers working on very specific pieces of these chips;
02:19:22 23 and therefore, it makes a difference whether they're
02:19:26 24 pointing to, you know, one cache or another cache. What is
02:19:29 25 it that they're talking about that it's supposed to be the

11

02:19:32 1 serial memory? What is it precisely that is supposed to be
02:19:36 2 the plurality of memory modules? What is it that is
02:19:41 3 supposed to be the plurality of parallel processors?
02:19:44 4 And that goes to some of the fundamental things
02:19:47 5 that we had put together in those slides. And with Your
02:19:53 6 Honor's indulgence, if I could, you know, go back to those
02:19:55 7 for a moment just to kind of give you an idea of how some of
02:19:59 8 these things actually come into play.
02:20:03 9 THE COURT: Well, I do have the slides in front
02:20:05 10 of me in color.
02:20:07 11 MR. BONDOR: Okay. All right. So if you look
02:20:11 12 at slide 2, this is just an overview of the various
02:20:15 13 processor architectures in chronological order starting on
02:20:19 14 the left, and then the various graphics architectures that
02:20:23 15 make a difference.
02:20:25 16 Now, by way of example, the only time that they
02:20:29 17 have shown anything in any of their charts related to the
02:20:33 18 plurality of parallel processors, they point back to the
02:20:37 19 same thing which is an excerpt from a Haswell. It's the
02:20:44 20 third one down on the left. And it happens to be from
02:20:49 21 graphics architecture GEM 7.5 G3.
02:20:56 22 Now, the issue, for instance, is that if that's
02:21:02 23 the only indication of the plurality of parallel processors,
02:21:06 24 we're left in the dark as to what precisely they're calling
02:21:11 25 the plurality of parallel processors because that particular

12

02:21:17 1 configuration, for instance, happens to have two what are --
02:21:23 2 so memory, some of the memory portions in these chips are
02:21:28 3 organized -- well, let me take one more step back.
02:21:30 4 The processors, the parallel -- the things that
02:21:34 5 XMITT is calling potentially parallel processors are either
02:21:41 6 groups of what are called execution units, or they're groups
02:21:46 7 of execution units that are called subslices, or they're
02:21:50 8 groups of subslices that are called slices. And so the
02:21:55 9 particular thing that they're pointing to, just the
02:22:02 10 baseline, what is the parallel -- what is the plurality of
02:22:02 11 parallel processors? They're -- when all they do is refer
02:22:07 12 to one instance that happens to have two slices, four
02:22:13 13 subslices, and 40 execution units, that leaves us in the
02:22:19 14 dark, if you look at slide 3, about what are the actual
02:22:25 15 allegations.
02:22:27 16 And if, as they treat them in the current -- all
02:22:32 17 renditions of the current infringement allegations, if they
02:22:37 18 treat them all together saying different numbers of
02:22:43 19 subslices, slices, each of which is a parallel processor,
02:22:47 20 that's the quotation there in the middle of slide 3 that
02:22:51 21 refers back to Exhibit D. Well, of the groups of things
02:22:51 22 that they say that they're infringing, not all of those
02:22:55 23 configurations have multiple slices or subslices.
02:23:00 24 So for things that -- if they are, in fact,
02:23:02 25 accusing slices or subslices and saying those are the

---

**13**

02:23:05  1    plurality, well, then certain of the products would drop out
02:23:09  2    entirely because they clearly don't have a plurality.  And
02:23:12  3    there's nothing in the allegation that says that any of that
02:23:17  4    could be a plurality.
02:23:19  5            If you turn to, for instance, a product with
02:23:24  6    more than one of those things, more than one EU, more than
02:23:28  7    one slice, more than one subslice, well, then exactly what
02:23:34  8    XMITT is accusing remains unknown.
02:23:39  9            Now, you might say to yourself, okay, well, you
02:23:42  10   know, it's just infringing contentions, so reasonable people
02:23:45  11   could figure that out.  But the issue is there are so many
02:23:50  12   other things that have to happen in terms of transfers to
02:23:56  13   what's called parallel processing mode, transfers of data
02:24:01  14   before that transition occurs, and certain information that
02:24:06  15   is supposed to go from one part of the chip to another part
02:24:10  16   of that chip related to those parallel processors, that in
02:24:15  17   order to understand what it is that we're supposed to be
02:24:18  18   looking at and understand what it is that is the assertion
02:24:24  19   that we're going to have to contest at trial, and indeed,
02:24:28  20   provide discovery about even now, we don't know which group
02:24:34  21   that we're supposed to pay attention to, and we don't know
02:24:39  22   which of those signals it is that we're supposed to pay
02:24:42  23   attention to.
02:24:43  24           So, for instance, if it were the case that XMITT
02:24:49  25   felt that its best infringement contention were to settle on

---

**14**

02:24:53  1    one of those subgroups, well, fine.  Tell us.  If it's that
02:24:57  2    they think that it should be all of them, they can tell us
02:25:00  3    that.  But if that's the case, then they need to spell out
02:25:05  4    how each of those things would work with respect to all the
02:25:10  5    other elements of the claim.  And fundamentally, that's what
02:25:15  6    they have not done just, for instance, with that particular
02:25:19  7    limitation.
02:25:20  8            And what I'm most concerned -- I'm concerned
02:25:23  9    about two things.  I'm concerned about fairness and I'm
02:25:26  10   concerned about discovery because from a fairness side of
02:25:31  11   things, if we're left just to scratch our heads about which
02:25:36  12   things are said to be the parallel processors and which
02:25:39  13   signals and which memory modules we're supposed to be
02:25:43  14   looking at, well then we're never going to know what the
02:25:47  15   real infringement case is until they file their opening
02:25:50  16   expert report and that will be after discovery closes.  So
02:25:55  17   we will be hamstrung in our ability to both understand the
02:26:00  18   case that's against us, and then use fact discovery to
02:26:05  19   prepare ourselves against it.
02:26:07  20           The second thing is, and I alluded to this
02:26:10  21   earlier, is this issue of, all right, you know, using a
02:26:18  22   somewhat different example, if you are going to call one
02:26:22  23   particular thing the serial memory, but the infringement
02:26:28  24   allegations, as they stand now, only say that the serial
02:26:33  25   memory may be any of the data cache units, mid-level caches,

---

**15**

02:26:39  1    L1 and L2 caches, well, it actually makes a difference
02:26:45  2    because, again, in each case we have to look at what data is
02:26:50  3    going into or out of those things.  We have to understand
02:26:53  4    because not all of the products have all of those things.
02:26:57  5    Not all of the families have all of those things.
02:27:00  6            And again, it's just a route question to say,
02:27:06  7    All right.  Well, what is the data transfer that we're
02:27:08  8    supposed to be looking for by way of example?  And if you
02:27:13  9    turn to slide 4 --
02:27:15  10           THE COURT:  Yeah, got it.
02:27:16  11           MR. ROWLES:  Your Honor, sorry, I don't mean to
02:27:20  12   interrupt.  This is Tony Rowles for XMITT.  I feel on slide
02:27:23  13   3, I think we're heading maybe down a path we don't need to
02:27:27  14   head down to because the slide does not accurately
02:27:31  15   characterize the contention that it's quoting from.  There's
02:27:35  16   a small excerpt from page 17 of Exhibit D that suggests that
02:27:41  17   our contention is that it only these groupings of slices and
02:27:45  18   subslices are parallel processors.  And one page prior, on
02:27:50  19   page 16, actually the first substantive part of the element
02:27:56  20   says, For example, the Intel GEM microprocessors include a
02:28:02  21   plurality of execution units, EUs, that are parallel
02:28:04  22   processors adapted to execute software instructions
02:28:07  23   primarily in parallel, and then there's a citation to Intel
02:28:11  24   technical documentation describing what an execution unit
02:28:14  25   is, and then the following page explains that even when

---

**16**

02:28:16  1    those execution units are grouped into slices or subslices,
02:28:20  2    those can also function as parallel processors, and many of
02:28:24  3    the products have a plurality of those.
02:28:27  4            So the issue here is not that no one knows what
02:28:31  5    products are accused or the products are going to drop out
02:28:34  6    depending on a theory.  Every accused product has this one
02:28:39  7    configuration, has plurality of execution units.  Most of
02:28:43  8    the products have groupings.  So you have sort of a
02:28:48  9    configuration A, a configuration B.
02:28:50  10           We explained in our charts why there's
02:28:53  11   infringement under version A, or version B, or A and B
02:28:57  12   combined.  This covers all the products, and there's no
02:29:00  13   confusion about whether a particular product has two
02:29:06  14   subslices or only one.  This is all readily apparent from
02:29:12  15   looking at the products.  It's actually publicly available
02:29:14  16   information even.
02:29:15  17           And so there's the idea that discovery is going
02:29:18  18   to be drastically different depending on whether ultimately
02:29:23  19   at trial we're talking about a plurality of one type of
02:29:27  20   grouping or not.  It's just not correct.  We want discovery
02:29:32  21   on execution units and how they are arranged in the
02:29:36  22   different products.  And we're talking about a small
02:29:38  23   universe of permutations here.
02:29:41  24           The same with serial memory and other types of
02:29:44  25   memories identified, we've identified three or four

---

17

```
02:29:46  1  different types of serial memories, three or four different
02:29:49  2  types of local read-only memories in different products.
02:29:53  3  It's readily apparent to everyone when a particular product
02:29:57  4  may only have two out of those three examples of memory,
02:30:02  5  we'll conduct discovery into all of those.  And I think --
02:30:06  6  respectfully, I don't think that it's really unclear what we
02:30:11  7  need to conduct discovery into or what the infringement
02:30:16  8  theory is.
02:30:18  9         And the question of what the best plurality of
02:30:22 10  parallel processors that we may point to later on, that's
02:30:26 11  something that will develop in discovery and as we get the
02:30:29 12  Court's claim construction.  But the universe of facts that
02:30:33 13  the parties need to explore at this stage, I think, is clear
02:30:37 14  and is not so unbounded that the parties can't conduct fair
02:30:42 15  and efficient discovery which we're in the midst of right
02:30:45 16  now.  I'd note for the Court that the parties have not yet
02:30:51 17  completed the even production of document discovery due to
02:30:55 18  some technical issues on Intel's side that have caused some
02:30:58 19  delays.  The substantive depositions of technical witnesses
02:31:03 20  have not begun in earnest.  As the Court is aware, we have
02:31:07 21  not yet had a claim construction hearing.
02:31:11 22         These slight differences between the different
02:31:14 23  possible infringement theories are going to be narrowed as
02:31:18 24  discovery proceeds, but the universe of what we're talking
02:31:23 25  about and what the theory or theories that we may contend to
```

18

```
02:31:28  1  be infringed by the different products are, I think,
02:31:30  2  apparent from the charts.  And one point I would note is
02:31:35  3  that our original charts, what has been described as a
02:31:39  4  summary or sort of a master infringement chart, was our
02:31:44  5  initial infringement chart in the case that we provided in
02:31:47  6  response to the first deadline, and it's in response to
02:31:50  7  requests from Intel that said, well -- and our initial chart
02:31:56  8  was based on their own internal documentation which it's at
02:32:01  9  the level of multiple products generations.  So the
02:32:04 10  difference between what was identified as Haswell and other
02:32:09 11  configurations are all addressed in master technical
02:32:13 12  documentation that we cited to in the charts.
02:32:15 13         And in response to requests from Intel, we
02:32:19 14  separated into subcharts different generations and did not
02:32:24 15  include, for example, the citations to a doorbell in the
02:32:28 16  particular subgroups that don't have a doorbell because we
02:32:31 17  cited to other components, messages sent to a command buffer
02:32:36 18  in those particular components that satisfy the claim
02:32:39 19  limitation in those configurations.  And so --
02:32:43 20         MR. BONDOR:  Your Honor, I have to jump in
02:32:45 21  there, too.  I'll let Mr. Rowles finish, but I want to
02:32:49 22  respond to that.
02:32:52 23         THE COURT:  All right.  Go ahead, Mr. Rowles.
02:32:56 24         MR. ROWLES:  Well, Your Honor, it's Mr. Bondor
02:33:04 25  who just jumped in.
```

19

```
02:33:05  1         THE COURT:  Yeah, but I thought he was saying he
02:33:07  2  was making a marker.  He was going to let you finish.
02:33:09  3         So are you finished, Mr. Bondor?
02:33:13  4         MR. BONDOR:  I'm not as of yet, Your Honor.
02:33:15  5  What I was explaining is that the master chart or the
02:33:19  6  summary chart identified, just to use an example of a
02:33:23  7  doorbell, the claim element at issue talks about data
02:33:29  8  transfer beginning prior to other events happening.  This is
02:33:34  9  prior to a transition, and there are various timing elements
02:33:37 10  in the claim element that we've been discussing.  And so
02:33:40 11  we've begun our discussion with what begins that data
02:33:44 12  transfer process, and this is explained in the chart first
02:33:47 13  in reference to doorbell.
02:33:50 14         In other -- the subcharts, there's no reference
02:33:53 15  to a doorbell in products that don't have a doorbell.
02:33:57 16  Instead, there's reference to writing commands into a
02:34:00 17  command buffer that serves the same function in those
02:34:03 18  variations of the product.  And we follow that path to
02:34:09 19  discuss a synchronization process.  So each of the accused
02:34:12 20  products has what's called a synchronization process where
02:34:16 21  they organize the timing of when the serial processor
02:34:20 22  initiates this data transfer versus when the parallel
02:34:24 23  processor begins processing, and there's some communication
02:34:27 24  back and forth that happens as part of that synchronization
02:34:30 25  process.  That's what we've identified in the chart, and
```

20

```
02:34:32  1  that's what we're relying on for our infringement theory.
02:34:35  2         And the question of whether -- and the questions
02:34:40  3  raised by Mr. Bondor in his earlier explanation of, Well, we
02:34:43  4  don't know that a particular acknowledgment reaches this
02:34:48  5  particular serial memory, that may well be a
02:34:51  6  non-infringement argument that they want to pursue, but this
02:34:54  7  is our theory.  Our theory is that the communication back
02:34:57  8  and forth that happens as part of that synchronization maps
02:35:01  9  to the claim element having to do with the synchronization
02:35:06 10  of data transfers and processing.  And that's described
02:35:11 11  based on the reference to that exact functionality in the
02:35:14 12  Intel documentation which describes, again, at a summary
02:35:19 13  level how synchronization happens in all the different
02:35:24 14  permutations of their graphics configuration.
02:35:25 15         So I'll stop there, but our view is that we've
02:35:30 16  described the functionality that we're going to point to for
02:35:36 17  infringement in all of the relevant accused products.  And
02:35:41 18  the question of whether that functionality actually
02:35:45 19  satisfies the claim limitation, that's something that the
02:35:47 20  parties will likely disagree on all the way through trial.
02:35:51 21  But there's no dispute about what components in the product
02:35:56 22  that we're pointing to as satisfying infringement are, and I
02:36:02 23  think the fact that this is apparent between the parties is
02:36:04 24  obviously when you look at the invalidity contentions that
02:36:14 25  Intel has served which also addressed these same functions,
```

21

02:36:17 1 these same claim elements at the same or less level of
02:36:20 2 detail then XMITT does in its contentions. In fact, there's
02:36:26 3 a mirror image almost of invalidity contentions and
02:36:33 4 infringement contentions for respect to some products
02:36:35 5 because Intel is alleging that certain of its earlier
02:36:40 6 product generations are qualified as prior art. And we
02:36:44 7 noted this in our letter, but if you compare side by side,
02:36:47 8 the invalidity contention for the earlier generation Intel
02:36:50 9 product and the infringement contention for the current
02:36:53 10 generation Intel product, what you'll see is that Intel's
02:36:57 11 invalidity chart is essentially our infringement chart with
02:37:02 12 all of the narrative --
02:37:02 13        THE COURT: Mr. Rowles, can you hear me?
02:37:04 14        MR. ROWLES: It's simply a recitation of the
02:37:07 15 claim followed by copy and paste excerpts from technical
02:37:11 16 documents with no explanation of what references what. And
02:37:14 17 that's the level that the parties have been addressing
02:37:19 18 contentions at is this is what we may rely on. We know what
02:37:22 19 disclosure they may rely on or what functionality in their
02:37:26 20 alleged prior art they may rely on.
02:37:28 21        And by the same token, Intel knows what
02:37:33 22 memories, what processors, what groupings of processors we
02:37:38 23 intend to rely on for infringement. And I don't think that
02:37:42 24 any of that is insufficient for the parties to efficiently
02:37:45 25 conduct discovery and proceed with the case.

22

02:37:48 1        THE COURT: All right. Thank you, Mr. Rowles.
02:37:49 2 It only took you five minutes after you said you were done
02:37:52 3 to stop talking. I only mention that because one of the
02:37:55 4 reasons why I don't normally do these things over the phone
02:37:58 5 is because when you're talking, I can't stop you.
02:38:04 6        Mr. Bondor, before you say whatever you have to
02:38:06 7 say, put a watch or some other thing nearby, and if you're
02:38:11 8 still talking after two minutes, stop. Okay?
02:38:18 9        MR. BONDOR: Absolutely, Your Honor. Let me
02:38:20 10 know when I'm ready to go.
02:38:21 11        THE COURT: Well, you can start.
02:38:23 12        MR. BONDOR: Okay, perfect. All right. So I
02:38:25 13 want to start actually just by focusing particularly on
02:38:29 14 page 69 because I think that that's a microcosm of all of
02:38:32 15 the issues that we're talking about here. If you still have
02:38:36 16 69 in front of you --
02:38:37 17        THE COURT: I do.
02:38:37 18        MR. BONDOR: -- from Exhibit F. All right. So
02:38:39 19 we see that the claim language on the left-hand side says a
02:38:43 20 transition from a serial processing mode to a parallel
02:38:46 21 processing mode. The accused product, this is the chart
02:38:49 22 that they're relying on. The accused product, the only
02:38:52 23 place where you will see that language again is in that very
02:38:55 24 first part where they parrot the claim language. Nowhere
02:39:00 25 else. There's nothing even that says, Oh, by the way, the

23

02:39:03 1 doorbell is the transition. For a variety of reasons, the
02:39:06 2 doorbell actually couldn't be the transition. But to
02:39:09 3 address that doorbell point, when XMITT took that out, they
02:39:14 4 put zero in again.
02:39:16 5        But then we can continue on that same page and
02:39:19 6 say, We don't know when the transition happens, but we know
02:39:23 7 that whatever it is, it's supposed to provide for a transfer
02:39:26 8 of updated data from the serial memory to at least one of
02:39:30 9 the plurality of partition memory modules.
02:39:32 10        And so let's look at what they have. They have
02:39:35 11 this typical submission sequence. It refers to the
02:39:39 12 doorbell, but it doesn't say anything about data being
02:39:41 13 transferred. It doesn't say anything about data coming from
02:39:43 14 the serial memory. It doesn't say whether that's going
02:39:47 15 to whatever they're calling the plurality of memory modules.
02:39:51 16        If we go down, there is -- data is transferred
02:39:54 17 from the memory to the plurality of shared memory modules,
02:39:58 18 but it doesn't say what it's talking about. Again, it's
02:40:02 19 just mimicking or parroting the claim language itself.
02:40:08 20        Now, if we keep going down to the
02:40:15 21 synchronization, type of synchronization, again, none of
02:40:15 22 that language says anything that it's supposed to be
02:40:19 23 identified as the serial memory. It doesn't identify the
02:40:22 24 data. It just -- and nothing says that the serial processor
02:40:25 25 is controlling this stuff.

24

02:40:27 1        So it isn't enough just to, you know, put
02:40:32 2 together a series of technical descriptions of things while
02:40:37 3 ignoring the fact that a transition is said to happen, but
02:40:42 4 not telling us where that is. The fact that updated data is
02:40:45 5 supposed to happen, but not telling us where that is. The
02:40:48 6 fact that it's supposed to come from serial memory, but not
02:40:51 7 telling us where that is. And the fact that it's supposed
02:40:53 8 to go to the plurality of partition memory modules and not
02:40:57 9 telling us where that is, either.
02:40:58 10        And I could continue -- I'm going to stop now
02:41:00 11 because my time is up, but I could continue through the rest
02:41:04 12 of this excerpt, 69 to 91, and nowhere in any of those
02:41:09 13 passages is any light shed on any of those things. And I
02:41:13 14 still want to get back to why, also, why it makes a
02:41:17 15 difference what they call the parallel processors, but I'm
02:41:20 16 going to stop.
02:41:20 17        THE COURT: Okay. Well, Mr. Bondor, thank you
02:41:22 18 for stopping. I understand you might want to get back to
02:41:24 19 some other things, but I have a limited amount of time here.
02:41:30 20        Is it the case, under the scheduling order in
02:41:33 21 this case, that these are preliminary infringement
02:41:37 22 contentions?
02:41:39 23        MR. BONDOR: I mean, I think there's only -- I
02:41:41 24 think that these are disclosed, yes. I believe that they
02:41:44 25 are -- well, they're not called preliminary infringement

25

02:41:48 1 contentions. I believe that the language that the
02:41:52 2 scheduling order uses is consistent with the ordinary use
02:41:56 3 which is that it is supposed to provide a claim chart
02:42:04 4 relating each accused product to the asserted claim each
02:42:08 5 product allegedly infringes. And you know, again, for the
02:42:12 6 purposes that I began the call with, for both fairness and
02:42:16 7 for discovery, we need to know what those things are.
02:42:21 8         THE COURT: All right. Mr. Rowles, Rowles,
02:42:26 9 whatever your name is. Mr. Rowles.
02:42:30 10        MR. ROWLES: It's Mr. Rowles.
02:42:31 11        THE COURT: Sorry. Mr. Bondor is known to me,
02:42:33 12 but I don't think I've ever met you before.
02:42:40 13        In the normal course, once there's a claim
02:42:44 14 construction, maybe once some other stuff happens, I take it
02:42:49 15 you were telling me that you don't view these as being your
02:42:52 16 final infringement contentions?
02:42:54 17        MR. ROWLES: That's correct, Your Honor. And
02:42:57 18 I'll note that the scheduling order, what the parties did is
02:43:01 19 just made reference to the Delaware default standard which
02:43:05 20 I'm sure Your Honor knows identifies disclosure of initial
02:43:09 21 contentions, and then there's that parties will be permitted
02:43:12 22 to supplement initial disclosures. And our view is that,
02:43:18 23 yeah, in fact, I think every claim element that we've spoken
02:43:21 24 about today is one where there's a disputed claim
02:43:27 25 construction. And so I expect that, depending on what the

26

02:43:29 1 Court's construction is, of course, further supplementation
02:43:32 2 may be required as well as we conduct additional technical
02:43:36 3 discovery, that sort of thing.
02:43:37 4         THE COURT: And --
02:43:39 5         MR. BONDOR: However, there are --
02:43:40 6         THE COURT: Mr. Rowles, the 700 accused
02:43:46 7 processors, can you tell from looking at your nine charts
02:43:50 8 which accused processors go with which of the nine charts?
02:43:55 9         MR. ROWLES: You can, Your Honor, and I could
02:43:58 10 give you an example from the exhibits.
02:44:01 11        THE COURT: Not necessary. Mr. Bondor, you seem
02:44:06 12 like --
02:44:06 13        MR. ROWLES: Yes, there's a table.
02:44:08 14        THE COURT: Mr. Bondor.
02:44:09 15        MR. ROWLES: There's a table with specific model
02:44:11 16 numbers for every chart.
02:44:12 17        THE COURT: Okay. Thank you.
02:44:13 18        Mr. Bondor, you seemed to want to say something
02:44:16 19 else. What was that?
02:44:19 20        MR. BONDOR: The else I wanted to say was I
02:44:22 21 don't believe that it's true that these things are
02:44:25 22 intimately tied up all in claim construction disputes,
02:44:29 23 either. For instance, you know, the parties have agreed on
02:44:32 24 the construction of the transition term, but all of the
02:44:35 25 charts are entirely silent as to what manifests that

27

02:44:39 1 transition term. They just don't say anything about it.
02:44:43 2         Likewise, I don't think that either party has
02:44:46 3 proposed a construction for parallel processors. You know
02:44:50 4 the issue is, again, going back to which memories are we
02:44:54 5 looking at, which memories are we supposed to be paying
02:44:57 6 attention to. It makes a difference with whether you choose
02:45:00 7 an execution unit, a subslice, or a slice as to which are
02:45:03 8 the supposedly implicated memories for the rest of the
02:45:07 9 claim.
02:45:07 10        So it isn't a question that we -- you know, the
02:45:11 11 titles of the charts tell us what they purport to relate to,
02:45:15 12 but the problem is that the actual alleged infringement is
02:45:19 13 not contained within the chart. It's just this mosaic of
02:45:24 14 pieces that is cobbled together in each chart that is
02:45:29 15 enormously repetitive, and you know, again, like I said
02:45:33 16 earlier with the mash-up point, isn't even unique to each of
02:45:37 17 those individual things.
02:45:39 18        For instance, in each case, every case, this
02:45:43 19 supposed serial processor is a serial processor that they
02:45:47 20 point to documentation associated with a project called code
02:45:52 21 name Gesher which preexists any of the accused product
02:45:57 22 families. So it's not even related to anything that even
02:46:01 23 XMITT is saying is, in fact, accused in the case.
02:46:04 24        THE COURT: All right. Mr. Bondor, thank you.
02:46:08 25        So here's what I think which is from what I can

28

02:46:22 1 tell, the various claim charts that had been submitted
02:46:31 2 purport to identify which of the accused products they
02:46:38 3 relate to. I believe that they purport in some way to
02:46:44 4 explain why the accused products can be grouped together.
02:46:52 5 And for that reason, it seems to me like representative
02:47:00 6 charts that are what these are supposed to be sufficient.
02:47:08 7         In terms of the more granular thing that we
02:47:11 8 spent some time talking about, you know, basically Intel's
02:47:20 9 position, you know, is pretty close to a summary judgment
02:47:26 10 motion and depends upon a level of analysis that I'm not
02:47:36 11 inclined to apply to infringement charts. You know, based
02:47:45 12 on what I've seen about infringement charts over the years,
02:47:49 13 these seem like a more than reasonable effort at the initial
02:47:55 14 infringement contentions, and I'm not going to order any
02:48:03 15 supplementation based on the arguments that have been raised
02:48:10 16 by Intel. So I'm going to deny Intel's request, and that's
02:48:17 17 it.
02:48:18 18        Thank you for calling in. I will, you know, in
02:48:25 19 terms of the Markman hearing, when we get a better sense of
02:48:29 20 exactly how we're responding to the current situation, we'll
02:48:35 21 reschedule that. You know, there's some talk about doing
02:48:41 22 Markmans over the phone. If I thought that was a
02:48:45 23 possibility, that I was ready for that possibility, maybe I
02:48:45 24 would have kept it on the schedule for this morning, but
02:48:53 25 right now I think that I would benefit a lot more from

29

02:49:04 1 having an argument in person that does not have the same
02:49:08 2 frustrations for me as the argument over the phone does.
02:49:13 3          And so I don't know when some amount of clarity
02:49:21 4 is going to come as to what the limitations are, but I will
02:49:29 5 try to get that rescheduled once I have some idea of whether
02:49:35 6 or not it can be done in person or not.  So actually I guess
02:49:46 7 I would just ask, I take it, Mr. Rowles, was it you who was
02:49:53 8 the person who, for reasons we don't need to state on the
02:49:57 9 phone, didn't want to travel here, or was that your comrade?
02:50:06 10          MR. ROWLES:  That is me, Your Honor.
02:50:08 11          THE COURT:  Okay.  The circumstances that make
02:50:13 12 it difficult for you to travel here, how many more weeks or
02:50:20 13 months is that likely to last?
02:50:22 14          MR. ROWLES:  We are 20 weeks into that exercise,
02:50:28 15 Your Honor.
02:50:28 16          THE COURT:  Okay.  So 16 more weeks?  Or yeah.
02:50:34 17          MR. ROWLES:  Something like that, maybe another
02:50:36 18 20.  I'll admit I'm not as informed as I probably should be,
02:50:40 19 but I think we're somewhere around halfway through.
02:50:44 20          I note for the Court we, I think like you are,
02:50:49 21 are reacting to information that just sort of seems to be
02:50:52 22 changing every day.  So, unfortunately, I just don't have a
02:50:57 23 whole lot of clarity.  I just understand that it's
02:51:00 24 considered a very high risk.
02:51:02 25          THE COURT:  Got it.

30

02:51:04 1          MR. ROWLES:  It would serve --
02:51:07 2          THE COURT:  Okay.  So we'll get back to you on
02:51:09 3 that, but I do appreciate the timetable, and we'll just have
02:51:18 4 to see about that.
02:51:21 5          All right.  Well, thank you for your time today.
02:51:26 6 I'm going to hang up.  Goodbye.
02:51:31 7          MR. BONDOR:  Your Honor.
02:51:32 8          THE COURT:  Yes.
02:51:34 9          MR. BONDOR:  I just wanted to put something on
02:51:35 10 your radar screen.  Mr. Rowles alluded to it, but the
02:51:39 11 parties are discussing a stipulation with respect to
02:51:43 12 extending the timeline for substantial document production
02:51:47 13 because Intel's litigation vendor Epic suffered a Ransomware
02:51:54 14 attack at the end of February, and the systems have been
02:51:56 15 down for weeks.  So we're trying to put together something
02:51:59 16 that we can all get on the same page with in order to, you
02:52:04 17 know, get that date dealt with, but get it dealt with after
02:52:09 18 our systems come back up and give us an opportunity to
02:52:13 19 actually move forward.  It's just as opposed to just waiting
02:52:17 20 for the systems to come back up.  That's likely to reach you
02:52:20 21 in the next week or so whether by stipulation or by motion.
02:52:24 22          THE COURT:  Okay.  So I remember getting
02:52:26 23 something about the Epic Ransomware in one of my 500 patent
02:52:30 24 cases, but only one.
02:52:32 25          Was that you?

31

02:52:33 1          MR. BONDOR:  No, I don't think we've brought it
02:52:36 2 up to you yet.
02:52:38 3          THE COURT:  Okay.
02:52:38 4          MR. BONDOR:  It is something that -- yeah.
02:52:40 5          THE COURT:  I was just curious because, you
02:52:43 6 know, I sign lots of documents, and I did see that
02:52:46 7 somewhere.  But, yeah, obviously, at least in the other
02:52:49 8 case, whatever it was, it was two parties that, you know,
02:52:53 9 are generally aggressive in litigation, but they did
02:52:59 10 stipulate to an extension there.  Because after all, how can
02:53:02 11 you predict that kind of thing.
02:53:06 12          So presumably, if you all can work something
02:53:13 13 out, obviously, I am going to be pretty agreeable.  I would
02:53:15 14 hope there's no need for a motion.
02:53:17 15          Okay?
02:53:19 16          MR. BONDOR:  Understood, Your Honor.  Thank you.
02:53:21 17          THE COURT:  All right.  Bye-bye.
02:53:22 18          MR. BONDOR:  Thank you, Your Honor.
19          (Teleconference was concluded at 2:53 p.m.)
20          I hereby certify the foregoing is a true and
21 accurate transcript from my stenographic notes in the
22 proceeding.
23          /s/ Heather M. Triozzi
             Certified Merit and Real-Time Reporter
24           U.S. District Court
25

# EXHIBIT C
# FILED UNDER SEAL

# EXHIBIT D
# FILED UNDER SEAL